UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                      Case No. 10-CR-12

TRAVIS LUEDKE,

    Defendant.

## PLEA AGREEMENT

1.      The United States of America, by its attorneys, James L. Santelle, United States Attorney for the Eastern District of Wisconsin, and Gregory J. Haanstad, First Assistant United States Attorney, and the defendant, Travis Luedke, individually and by attorney Thomas G. Wilmouth, pursuant to Rule 11 of the Federal Rules of Criminal Procedure, enter into the following plea agreement:

### CHARGES

2.      The defendant has been charged in each count of a two-count indictment, which alleges violations of Title 18, United States Code, Sections 1343, 1349, and 2.

3.      The defendant has read and fully understands the charges contained in the indictment. He fully understands the nature and elements of the crimes with which he has been charged, and those charges and the terms and conditions of the plea agreement have been fully explained to him by his attorney.

4.      The defendant voluntarily agrees to plead guilty to count one of the indictment. That count is set forth in full in Attachment A to this plea agreement.

5. The defendant acknowledges, understands, and agrees that he is, in fact, guilty of the offense charged in count one of the indictment. The parties acknowledge and understand that if this case were to proceed to trial, the government would be able to prove beyond a reasonable doubt the facts set forth in Attachment B to this plea agreement. The defendant admits that those facts are true and correct and that they establish his guilt beyond a reasonable doubt. The description of facts in Attachment B is provided for the purpose of setting forth a factual basis for the plea of guilty. It is not a full recitation of the defendant's knowledge of, or participation in, this offense.

## PENALTIES

6. The parties understand and agree that the offense to which the defendant will enter a plea of guilty carries a maximum of twenty years of imprisonment, a $250,000 fine, and 3 years of supervised release. The count also carries a mandatory special assessment of $100. The parties further recognize that a restitution order may be entered by the court. The parties' acknowledgments, understandings, and agreements with regard to restitution are set forth in paragraph 29 of this agreement.

7. The defendant acknowledges, understands, and agrees that he has discussed the relevant statutes as well as the applicable sentencing guidelines with his attorney.

## DISMISSAL OF REMAINING COUNT OF INDICTMENT

8. The government agrees to move to dismiss the remaining count of the indictment at the time of sentencing.

## ELEMENTS

9. The parties understand and agree that in order to sustain the conspiracy charge set forth in count one, the government must prove each of the following propositions beyond a reasonable doubt:

First, that the conspiracy as charged in the indictment existed; and

Second, that the defendant knowingly became a member of the conspiracy with an intention to further the conspiracy.

## SENTENCING PROVISIONS

10. The parties agree to waive the time limits in Fed. R. Crim. P. 32 relating to the presentence report, including that the presentence report be disclosed not less than 35 days before the sentencing hearing, in favor of a schedule for disclosure, and the filing of any objections, to be established by the court at the change of plea hearing.

11. The parties acknowledge, understand, and agree that any sentence imposed by the court will be pursuant to the Sentencing Reform Act, and that the court will give due regard to the Sentencing Guidelines when sentencing the defendant.

12. The parties acknowledge and agree that they have discussed all of the sentencing guidelines provisions which they believe to be applicable to the offense charged in count one. The defendant acknowledges and agrees that his attorney in turn has discussed the applicable sentencing guidelines provisions with him to the defendant's satisfaction.

13. The parties acknowledge and understand that prior to sentencing the United States Probation Office will conduct its own investigation of the defendant's criminal history. The parties further acknowledge and understand that, at the time the defendant enters a guilty plea,

3

the parties may not have full and complete information regarding the defendant's criminal history. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentencing court's determination of the defendant's criminal history.

## Sentencing Guidelines Calculations

14. The parties acknowledge, understand, and agree that the sentencing guidelines calculations included in this agreement represent the positions of the parties on the appropriate sentence range under the sentencing guidelines. The defendant acknowledges and understands that the sentencing guidelines recommendations contained in this agreement do not create any right to be sentenced within any particular sentence range, and that the court may impose a reasonable sentence above or below the guideline range. The parties further understand and agree that if the defendant has provided false, incomplete, or inaccurate information that affects the calculations, the government is not bound to make the recommendations contained in this agreement.

## Relevant Conduct

15. The parties acknowledge, understand, and agree that pursuant to Sentencing Guidelines Manual § 1B1.3, the sentencing judge may consider relevant conduct in calculating the sentencing guidelines range, even if the relevant conduct is not the subject of the offense to which the defendant is pleading guilty.

4

### Base Offense Level

16. The parties agree to recommend to the sentencing court that the applicable base offense level for the offense charged in count one is 7 under Sentencing Guidelines Manual § 2B1.1(a)(1).

### Specific Offense Characteristics

17. The parties agree to recommend to the sentencing court that, because the amount of loss was more than $1,000,000, a 16-level increase is applicable under Sentencing Guidelines Manual § 2B1.1(b)(1)(I).

18. The parties agree to recommend to the sentencing court that, because the offense involved 10 or more victims, a 2-level increase is applicable under Sentencing Guidelines Manual § 2B1.1(b)(2)(A).

19. The parties agree to recommend to the sentencing court that, because the defendant abused a position of private trust in a manner that significantly facilitated the commission of the offense, a 2-level increase is applicable under Sentencing Guidelines Manual § 3B1.3.

### Acceptance of Responsibility

20. The government agrees to recommend a two-level decrease for acceptance of responsibility as authorized by Sentencing Guidelines Manual § 3E1.1(a), but only if the defendant exhibits conduct consistent with the acceptance of responsibility. The defendant acknowledges, understands, and agrees that conduct consistent with the acceptance of responsibility includes but is not limited to the defendant's voluntary identification and disclosure to the government of any and all actual or potential victims of the offense prior to

Case 2:10-cr-00012-LA   Filed 10/22/10   Page 5 of 16   Document 29

sentencing. In addition, if the court determines at the time of sentencing that the defendant is entitled to the two-level reduction under § 3E1.1(a), the government agrees to make a motion recommending an additional one-level decrease as authorized by Sentencing Guidelines Manual § 3E1.1(b) because the defendant timely notified authorities of his intention to enter a plea of guilty.

21. The parties agree to recommend to recommend to the sentencing court that no other adjustments apply under Chapter Two or Chapter Three of the Sentencing Guidelines Manual.

## Sentencing Recommendations

22. Both parties reserve the right to provide the district court and the probation office with any and all information which might be pertinent to the sentencing process, including but not limited to any and all conduct related to the offense as well as any and all matters which might constitute aggravating or mitigating sentencing factors.

23. Both parties reserve the right to make any recommendation regarding any other matters not specifically addressed by this agreement.

24. The government agrees to recommend a sentence within the applicable sentencing guideline range, as determined by the court.

## Court's Determinations at Sentencing

25. The parties acknowledge, understand, and agree that neither the sentencing court nor the United States Probation Office is a party to or bound by this agreement. The United States Probation Office will make its own recommendations to the sentencing court. The sentencing court will make its own determinations regarding any and all issues relating to the

imposition of sentence and may impose any sentence authorized by law up to the maximum penalties set forth in paragraph 6 above. The parties further understand that the sentencing court will be guided by the sentencing guidelines but will not be bound by the sentencing guidelines and may impose a reasonable sentence above or below the calculated guideline range.

26. The parties acknowledge, understand, and agree that the defendant may not move to withdraw the guilty plea solely as a result of the sentence imposed by the court.

## FINANCIAL MATTERS

27. The defendant acknowledges and understands that any and all financial obligations imposed by the sentencing court are due and payable upon entry of the judgment of conviction. The defendant agrees not to request any delay or stay in payment of any and all financial obligations.

28. The defendant agrees that, during the period of any supervision (probation or supervised release) imposed by the court in this case, the defendant will provide the Financial Litigation Unit (FLU) of the United States Attorney's Office with completed financial forms which will be provided by FLU, and will provide any documentation required by those forms. The defendant will provide FLU with such completed financial forms with required documentation within the first two months of supervision, at six month intervals thereafter during supervision, and within the last six months of scheduled supervision. The defendant acknowledges and agrees that, while he is on supervision, the Probation Department and FLU can exchange financial information pertaining to the defendant in order to facilitate collection of any fine or restitution ordered by the court as part of the sentence in this case.

7

### Special Assessment

29. The defendant agrees to pay the special assessment in the amount of $ 100 prior to or at the time of sentencing.

### Restitution

30. The defendant agrees to pay restitution as ordered by the court. The defendant understands that because restitution for the offense is mandatory, the amount of restitution shall be imposed by the court regardless of the defendant's financial resources. The defendant agrees to cooperate in efforts to collect the restitution obligation. The defendant understands that imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action.

### DEFENDANT'S COOPERATION

31. The defendant, by entering into this agreement, further agrees to fully and completely cooperate with the government in its investigation of this and related matters, and to testify truthfully and completely before the grand jury and at any subsequent trials or proceedings, if asked to do so. The government agrees to advise the sentencing judge of the nature and extent of the defendant's cooperation. The parties acknowledge, understand and agree that if the defendant provides substantial assistance to the government in the investigation or prosecution of others, the government, in its discretion, may recommend a downward departure from: (a) the applicable sentencing guideline range; (b) any applicable statutory mandatory minimum; or (c) both. The defendant acknowledges and understands that the court will make its own determination regarding the appropriateness and extent to which such cooperation should affect the sentence.

8

## DEFENDANT'S WAIVER OF RIGHTS

32. In entering this agreement, the defendant acknowledges and understands that in so doing he surrenders any claims he may have raised in any pretrial motion, as well as certain rights which include the following:

   a. If the defendant persisted in a plea of not guilty to the charges against him, he would be entitled to a speedy and public trial by a court or jury. The defendant has a right to a jury trial. However, in order that the trial be conducted by the judge sitting without a jury, the defendant, the government and the judge all must agree that the trial be conducted by the judge without a jury.

   b. If the trial is a jury trial, the jury would be composed of twelve citizens selected at random. The defendant and his attorney would have a say in who the jurors would be by removing prospective jurors for cause where actual bias or other disqualification is shown, or without cause by exercising peremptory challenges. The jury would have to agree unanimously before it could return a verdict of guilty. The court would instruct the jury that the defendant is presumed innocent until such time, if ever, as the government establishes guilt by competent evidence to the satisfaction of the jury beyond a reasonable doubt.

   c. If the trial is held by the judge without a jury, the judge would find the facts and determine, after hearing all of the evidence, whether or not he was persuaded of defendant's guilt beyond a reasonable doubt.

   d. At such trial, whether by a judge or a jury, the government would be required to present witnesses and other evidence against the defendant. The defendant would be able to confront witnesses upon whose testimony the government is relying to obtain a conviction and he would have the right to cross-examine those witnesses. In turn the defendant could, but is not obligated to, present witnesses and other evidence on his own behalf. The defendant would be entitled to compulsory process to call witnesses.

   e. At such trial, defendant would have a privilege against self-incrimination so that he could decline to testify and no inference of guilt could be drawn from his refusal to testify. If defendant desired to do so, he could testify on his own behalf.

9

33. The defendant acknowledges and understands that by pleading guilty he is waiving all the rights set forth above. The defendant further acknowledges the fact that his attorney has explained these rights to him and the consequences of his waiver of these rights. The defendant further acknowledges that as a part of the guilty plea hearing, the court may question the defendant under oath, on the record, and in the presence of counsel about the offense to which the defendant intends to plead guilty. The defendant further understands that the defendant's answers may later be used against the defendant in a prosecution for perjury or false statement.

34. The defendant acknowledges and understands that he will be adjudicated guilty of the offense to which he will plead guilty and thereby may be deprived of certain rights, including but not limited to the right to vote, to hold public office, to serve on a jury, to possess firearms, and to be employed by a federally insured financial institution.

35. The defendant knowingly and voluntarily waives all claims he may have based upon the statute of limitations, the Speedy Trial Act, and the speedy trial provisions of the Sixth Amendment. The defendant agrees that any delay between the filing of this agreement and the entry of the defendant's guilty plea pursuant to this agreement constitutes excludable time under the Speedy Trial Act.

### Further Civil or Administrative Action

36. The defendant acknowledges, understands, and agrees that the defendant has discussed with his attorney and understands that nothing contained in this agreement, including any attachment, is meant to limit the rights and authority of the United States of America or any other state or local government to take further civil, administrative, or regulatory action against

10

the defendant, including but not limited to any listing and debarment proceedings to restrict rights and opportunities of the defendant to contract with or receive assistance, loans, and benefits from United States government agencies.

## GENERAL MATTERS

37. The parties acknowledge, understand, and agree that this agreement does not require the government to take, or not to take, any particular position in any post-conviction motion or appeal.

38. The parties acknowledge, understand, and agree that the United States Attorney's office is free to notify any local, state, or federal agency of the defendant's conviction.

39. The defendant understands that pursuant to the Victim and Witness Protection Act, the Justice for All Act, and regulations promulgated thereto by the Attorney General of the United States, the victim of a crime may make a statement describing the impact of the offense on the victim and further may make a recommendation regarding the sentence to be imposed. The defendant acknowledges and understands that comments and recommendations by a victim may be different from those of the parties to this agreement.

## EFFECT OF DEFENDANT'S BREACH OF PLEA AGREEMENT

40. The defendant acknowledges and understands if he violates any term of this agreement at any time, engages in any further criminal activity prior to sentencing, or fails to appear for sentencing, this agreement shall become null and void at the discretion of the government. The defendant further acknowledges and understands that the government's agreement to dismiss any charge is conditional upon final resolution of this matter. If this plea agreement is revoked or if the defendant's conviction ultimately is overturned, then the

government retains the right to reinstate any and all dismissed charges and to file any and all charges which were not filed because of this agreement. The defendant hereby knowingly and voluntarily waives any defense based on the applicable statute of limitations for any charges filed against the defendant as a result of his breach of this agreement. The defendant understands, however, that the government may elect to proceed with the guilty plea and sentencing. If the defendant and his attorney have signed a proffer letter in connection with this case, then the defendant further acknowledges and understands that he continues to be subject to the terms of the proffer letter.

## VOLUNTARINESS OF DEFENDANT'S PLEA

41. The defendant acknowledges, understands, and agrees that he will plead guilty freely and voluntarily because he is in fact guilty. The defendant further acknowledges and agrees that no threats, promises, representations, or other inducements have been made, nor agreements reached, other than those set forth in this agreement, to induce the defendant to plead guilty.

## ACKNOWLEDGMENTS

I am the defendant. I am entering into this plea agreement freely and voluntarily. I am not now on or under the influence of any drug, medication, alcohol, or other intoxicant or depressant, whether or not prescribed by a physician, which would impair my ability to understand the terms and conditions of this agreement. My attorney has reviewed every part of this agreement with me and has advised me of the implications of the sentencing guidelines. I have discussed all aspects of this case with my attorney and I am satisfied that my attorney has provided effective assistance of counsel.

Date: 10.22.10

TRAVIS LUEDKE
Defendant

I am the defendant's attorney. I carefully have reviewed every part of this agreement with the defendant. To my knowledge, my client's decision to enter into this agreement is an informed and voluntary one.

Date: 10.22.10

THOMAS G. WILMOUTH
Attorney for Defendant

For the United States of America:

Date: 10/22/10

JAMES L. SANTELLE
United States Attorney

Date: 10/22/10

GREGORY J. HAANSTAD
First Assistant United States Attorney

13

## Attachment A

### THE GRAND JURY CHARGES:
### COUNT ONE

1. Beginning by April 2004 and continuing until December 2005, in the State and Eastern District of Wisconsin, and elsewhere,

**TRAVIS LUEDKE and
MICHAEL RAMER**

knowingly conspired with each other and with others known and unknown to the grand jury, to devise and execute a scheme to obtain money by means of material false and fraudulent pretenses and representations, and knowingly caused wire communications to be transmitted in interstate commerce for the purpose of executing the scheme. The fraudulent scheme is described below.

### Background

2. At all times relevant to this indictment, Travis Luedke was the registered agent and sole manager member of Exchange Growth League ("EGL"), a limited liability company organized in the State of Washington on April 1, 2004.

3. On April 6, 2004, Luedke opened an EGL business account at Bank of America in the State of Washington. At all times material to this indictment, Luedke was the sole signatory on that account.

4. At all times relevant to this indictment, Travis Luedke, Michael Ramer, M.L., and Ramer's wife were the sole managers and members of Western Corporate Management Group ("WCM"), a limited liability company organized in the State of Nevada on October 7, 2004.

5. On October 15, 2004, Ramer's wife opened a WCM business account at Bank of America in the State of Washington. At all times material to this indictment, Ramer's wife was the sole signatory on that account.

6. At all times relevant to this indictment, E.B. was Treasurer of Corporate Capital Funding ("CCF"), a corporation organized in the State of Nevada.

7. On February 13, 2004, E.B. opened a CCF business account at Wells Fargo Bank in the State of Nevada. At all times material to this indictment, E.B. was the sole signatory on that account.

Attachment A

## The Scheme

8.   Beginning in approximately April 2004, Luedke and Ramer solicited a number of individuals to invest through EGL in what Luedke and Ramer characterized as high-return, low-risk investments through EGL and WCM. Luedke and Ramer told investors that their funds would be invested in a variety of investment vehicles, including foreign currency markets, a Mexican gold mine, and real estate. Luedke and Ramer also told investors that, within a specified time after making an initial investment, the investors would receive returns on their investments in the form of monthly payments of between $10,000 and $25,000.

9.   Luedke and Ramer prepared contracts for the investors that explained the terms of the investments. Luedke and Ramer also directed the investors to wire funds to the EGL and WCM bank accounts.

10.   Rather than invest the funds as they had represented that they would, Luedke, Ramer, and their associates used the victims' funds for their own personal purposes.

11.   Between approximately June 2004 and February 2005, Luedke and Ramer, by their false representations that they would invest the victims' money, fraudulently induced victims to wire $677,500 to the EGL account, and $400,000 to the WCM account.

12.   Among those wire transfers was one from M.H. On February 8, 2005, at Luedke's direction, M.H. wired $160,000 from a TCF bank in Milwaukee, Wisconsin, into Luedke's EGL account in the State of Washington.

13.   Of the $677,500 wired to the EGL account, Luedke took $28,500 out in cash, and wired the balance to the WCM and CCF accounts.

14.   Luedke, Ramer, and their associates then withdrew the funds from the WCM and CCF accounts in cash, or otherwise used the funds for their own personal purposes.

15.   In furtherance of the conspiracy, between approximately June 2004 and December 2005, Luedke, Ramer, and their associates withdrew approximately $862,738.17 of investor money from the EGL, WCM, and CCF accounts. Luedke, Ramer, and their associates spent the balance of the investor funds on personal expenses through checks and debit transactions.

16.   The EGL and WCM investors were never paid returns on their initial investments.

All in violation of Title 18, United States Code, Sections 1343 and 1349.

2

Case 2:10-cr-00012-LA   Filed 10/22/10   Page 15 of 16   Document 29

Attachment B

In 2004, Travis Luedke and Michael Ramer began promoting investment programs under the names Exchange Growth League (EGL) and Western Corporate Management (WCM). Luedke was the registered agent and the sole member of EGL and was the only person with signing authority on EGL's bank account. Luedke, Ramer, and Ramer's wife were members of WCM, and Ramer's wife had sole signing authority on WCM's bank account.

Luedke and Ramer recruited a number of individuals to invest with EGL and WCM, promising large rates of return and guaranteeing that payments to the investor would begin within a fixed time period (usually between 45 days and 120 days from the time of the initial investment). Luedke and Ramer told the investors that they were investing in a wide variety of programs, including foreign money markets, real estate, and a Mexican gold mine.

Luedke and Ramer prepared contracts for the investors they recruited. The contracts guaranteed large returns on initial investments. After signing the contracts and mailing them to Luedke, the investors would send money via wire communications transmitted in interstate commerce to either the EGL account or the WCM account, as directed by Luedke or Ramer. Both accounts were at Bank of America, and Luedke told investor-victims to direct the transactions to the attention of L.M., a Bank of America employee who also was Luedke's wife.

Between mid-2004 and mid-2005, Luedke and Ramer induced investors to wire more than $1 million into the two accounts. Seven investors wired a total of $677,500 into the EGL account, and four other investors wired a total of $400,000 into the WCM account. In addition, of the $677,500 wired into the EGL account, $149,000 was immediately transferred to the WCM account; $28,500 was taken out in cash by Luedke; and $500,000 was wired to a Wells Fargo account opened in the name Corporate Capital Funding (CCF). Of the $549,000 in investor money that ultimately was deposited into the WCM account, $339,793.85 was converted to cash; all but $5,500 of the $500,000 in investor funds deposited into the CCF account was converted to cash. $11,000 TWL  TR MR

Luedke and Ramer made no legitimate attempt to invest the victims' money as Luedke had promised. The majority of the victims' money ($862,738 of the $1,077,500) was converted to cash. Luedke, Ramer, and other coconspirators spent the majority of that cash – as well as the balance of the accounts that was not converted to cash – on hotel rooms, rental cars, airfare, casinos, food, gas, clothes, and other miscellaneous personal expenses. The investor-victims were never paid anything – not returns, and not their principal investments – by Luedke, Ramer, or anyone associated with EGL, WCM or CCF. When they did not receive the monthly payments that they were promised, most of the victims contacted Luedke or Ramer, who provided a number of false explanations about the victims' money – and the returns on that money – being "tied up" and unavailable for payment.